IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

LINDY & FRED SECO GENERAL REVOKABLE TRUST,
Employer Below, Petitioner

**FILED**
**February 2, 2023**

EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

**vs.)    No. 22-ICA-82      (JCN: 2019026433)**

RONALD KELLER,
Claimant Below, Respondent

**MEMORANDUM DECISION**

Petitioner Lindy & Fred Seco General Revokable Trust, dba Chaney's Construction Renovations & Rentals ("CCRR"), appeals the August 4, 2022, order of the Board of Review ("Board"). Respondent Ronald Keller filed a timely response.[1] Petitioner did not file a reply. The issue on appeal is whether the Board erred in reversing the claim administrator's order that found Mr. Keller's claim for myelodysplastic syndrome ("MDS") not compensable.

This Court has jurisdiction over this appeal pursuant to West Virginia Code § 51-11-4 (2022). After considering the parties' written and oral arguments, the record on appeal, and the applicable law, this Court finds no substantial question of law and no prejudicial error.  For these reasons, a memorandum decision affirming the Board's Order is appropriate under Rule 21 of the Rules of Appellate Procedure.

Mr. Keller filed an Employees' and Physicians' Report of Injury form in June of 2019, alleging that he developed MDS[2] in the course of and as a result of his employment with CCRR. In an accompanying affidavit, Mr. Keller explained that since the early 1990s, he had consistently worked in the roofing industry and had been exposed to a myriad of roofing-related products that contained benzene. He worked for A-1 Roofs Done Right in 2001 and from 2009 through 2011, and then worked for CCRR from 2016 through 2017. Mr. Keller also worked as a self-employed roofer for a number of years, including while he was employed by CCRR. He stated that he worked around roofing materials approximately sixty hours per week, and that while employed as a roofer, he frequently used employer-supplied gasoline and petroleum products to wash his hands. Mr. Keller

---

[1] Petitioner is represented by T. Jonathan Cook, Esq. Respondent is represented by R. Dean Hartley, Esq.

[2] Mr. Keller was definitively diagnosed with MDS on June 21, 2017.

1

submitted medical records from Ohio Valley Medical Center, which indicated that he was referred for a hematological consultation, and testing revealed an abnormal karyotype with monosomy 7 (the deletion of the seventh chromosome) consistent with high-grade MDS. A bone marrow biopsy and further testing performed at WVU Medicine revealed findings consistent with MDS. By order dated June 26, 2019, the claim administrator denied Mr. Keller's application for benefits, finding that there was no medical evidence of a work-related injury or condition arising out of his employment with CCRR.

In January of 2020, Mr. Keller testified via deposition and described how he was diagnosed with MDS and his resulting treatment, which included chemotherapy and a bone marrow transplant. Mr. Keller stated that he had no family history of leukemia or MDS. Regarding his employment with CCRR, Mr. Keller testified that he began working there in 2016 and that he "mainly" did roofing, although he also did general repairs. Mr. Keller explained that while at CCRR he worked on roofs approximately ten to twenty hours per week and described his use of adhesives, tar, and other roofing products. Mr. Keller stated that when tar and other adhesives would get on his hands, he used gasoline to wash it off. He also admitted to having a twenty-year smoking habit.

In June of 2020, Vernon E. Rose, DrPH, authored a verified statement in which he opined that Mr. Keller's working conditions contributed to his development of MDS. Mr. Rose is a certified industrial hygienist, a certified safety professional, and a registered professional safety engineer with over fifty-six years of experience in the field of occupational health and safety. Mr. Rose identified several unsafe working conditions that he opined contributed to Mr. Keller's MDS diagnosis, including: (1) working around known toxic chemicals, including benzene, without any protection from inhalation or absorption; (2) working without required training on the hazards presented by roofing materials, chemicals, and solvents; (3) working without training on appropriate personal protective equipment; and (4) washing his hands with gasoline. According to Mr. Rose, benzene can enter the body through inhalation but up to 80% of the uptake can occur from vapor and liquid contact to the skin. Mr. Rose opined that the failures of Mr. Keller's various employers, including CCRR, "directly contributed to unsafe working conditions exposing Mr. Keller to elevated levels of cancer-causing and/or toxic chemicals, products, and materials that led to his illness."

At the request of CCRR, Christopher Martin, M.D., performed a record review of Mr. Keller's medical history in November of 2020. Dr. Martin opined that he was unable to conclude to a reasonable degree of medical certainty that Mr. Keller's diagnosis was causally related to his occupational exposure while employed by CCRR. Dr. Martin based his opinion on five factors. First, Dr. Martin stated that although there are epidemiological studies showing an association between benzene exposure and an increased risk for MDS, such association did not necessarily mean that Mr. Keller's diagnosis was due to excessive benzene exposure. He stated that other associations have been noted, including an increased risk for MDS among smokers. Second, Dr. Martin claimed that there was

conflicting evidence as to Mr. Keller's job description while at CCRR and the extent to which he was performing roofing repairs. Dr. Martin stated that he was unable to locate any epidemiological studies on associations between employment as a roofer and MDS. Third, although Mr. Keller experienced monosomy 7, which has been more frequently noted in cases of secondary MDS, Dr. Martin opined that monosomy 7 has also been seen in primary cases and is not necessarily the result of chemical exposure. Fourth, Dr. Martin stated that studies show that the majority of MDS cases are unexplained. Fifth, Dr. Martin explained that the latency period for MDS can be anywhere from five to fifteen years, which is less than the time Mr. Keller was employed by CCRR.

Later in November of 2020, Mr. Keller was evaluated by Amit Mehta, M.D., a hematologist. Dr. Mehta opined that "Mr. Keller has a medical history that is strongly consistent with . . . occupational exposure to benzene products (several hours a day, daily, and for over 25 years) being the direct causative factor resulting in his diagnosis of [MDS]." Dr. Mehta explained that Mr. Keller was relatively young at the time of diagnosis (the median age at diagnosis for MDS is seventy years old), had a high blast cell percentage of 18% (meaning that he was close to the threshold of being diagnosed with an acute myelogenous leukemia), and experienced abnormal blood cell formation from all three blood cell lines, which are features of a carcinogen exposure. Further, Mr. Keller's monosomy 7 was also consistent with a toxin exposure. Dr. Mehta noted that Mr. Keller had been exposed to benzene-containing products on a nearly daily basis for twenty-five years and added that it was well-established that benzene is a carcinogen, including for MDS. Dr. Mehta noted that Mr. Keller had a smoking history, but opined it was "comparatively minuscule when contrasted with his substantial chronic occupational exposure to benzene."

Michael Craig, M.D., Mr. Keller's oncologist, authored a letter in January of 2021, opining that Mr. Keller's work exposure likely contributed to his development of MDS given his overexposure to benzene and his young age at diagnosis. In June of 2021, Martyn T. Smith, Ph.D., authored a report for the purpose of the underlying litigation regarding whether benzene causes MDS. Dr. Smith concluded, to a reasonable degree of medical certainty, that occupational exposure of benzene causes MDS and opined that the latency period between the first date of exposure to the development of the disease could be as short as two years.

Dr. Martin testified via deposition in July of 2021. Dr. Martin reiterated his opinion that Mr. Keller's employment with CCRR did not lead to his development of MDS but clarified that he did not render an opinion as to whether Mr. Keller's benzene exposure prior to his employment at CCRR had contributed to its development. Dr. Martin agreed that benzene causes MDS and that Mr. Keller's exposure to benzene would qualify as overexposure to the substance. However, he opined that Mr. Keller's diagnosis was of unknown etiology. According to Dr. Martin, Mr. Keller's relatively young age at diagnosis was not reflective of secondary MDS—or benzene-induced MDS—but rather could be

attributed to people aging at different rates. Dr. Martin also stated that the duration of Mr. Keller's employment with CCRR and the long latency period of MDS contributed to his opinion that the diagnosis was not benzene related.

By order dated August 2, 2022, the Board reversed the claim administrator's order and held the claim compensable for MDS. In looking at West Virginia Code § 23-4-1(f) (2021), the Board found that all six factors for establishing an occupational disease were met.[3] The Board held that: (1) a causal connection exists between Mr. Keller's work conditions and his diagnosis of MDS; (2) Mr. Keller's MDS diagnosis followed as a natural incident of his work as a result of his exposure occasioned by the nature of his employment; (3) the proximate cause of Mr. Keller's MDS can be fairly traced to his employment; (4) Mr. Keller's MDS diagnosis did not come from a hazard to which he would have been equally exposed outside of his employment; (5) the use of benzene and benzene-containing products was incidental to the character of CCRR's business; and (6) the risk of MDS was a natural consequence of Mr. Keller's exposure to benzene and benzene-containing products while working for CCRR.

Specifically, the Board determined that Mr. Keller's MDS diagnosis was causally related to his employment. Per Mr. Rose's report, Mr. Keller was exposed to benzene while working as a roofer for CCRR and other employers, and that many of the products used by Mr. Keller, including gasoline, contained benzene. The Board pointed to Mr. Rose's statement that up to 80% of the uptake of benzene can occur through vapor and liquid

---

[3] West Virginia Code § 23-4-1(f) (2021) provides that:

> a disease is considered to have been incurred in the course of or to have resulted from the employment only if it is apparent to the rational mind, upon consideration of all the circumstances: (1) That there is a direct causal connection between the conditions under which work is performed and the occupational disease; (2) that it can be seen to have followed as a natural incident of the work as a result of the exposure occasioned by the nature of the employment; (3) that it can be fairly traced to the employment as the proximate cause; (4) that it does not come from a hazard to which workmen would have been equally exposed outside of the employment; (5) that it is incidental to the character of the business and not independent of the relation of employer and employee; and (6) that it appears to have had its origin in a risk connected with the employment and to have flowed from that source as a natural consequence, though it need not have been foreseen or expected before its contraction.

4

contact with the skin and noted that even CCRR's expert, Dr. Martin, conceded that Mr. Keller was over exposed to benzene. As such, the Board found that Mr. Keller was clearly exposed to benzene while working for CCRR and others.

The Board also found that Mr. Keller's occupational exposure to benzene was more likely than not a contributing factor in his MDS development. According to the Board, there was no evidence to indicate that an "exposure intensity threshold exists for benzene-induced MDS." In other words, "the amount and/or duration of benzene exposure that is required to cause MDS is not clearly defined and is a matter of professional judgment." The Board found that, here, Dr. Ross (one of Mr. Keller's treating physicians), Mr. Rose, Dr. Mehta, and Dr. Craig all opined that Mr. Keller's occupational exposure contributed to his MDS diagnosis while only Dr. Martin asserted that Mr. Keller's exposure while employed at CCRR was insufficient to cause his diagnosis. The Board found the opinions of Dr. Ross, Dr. Mehta, and Dr. Craig to be more compelling and persuasive than that of Dr. Martin. Specifically, the Board noted that Dr. Ross, Dr. Mehta, and Dr. Craig all personally examined and interviewed Mr. Keller while Dr. Martin simply performed a record review. Indeed, Dr. Ross and Dr. Craig "both followed and treated" Mr. Keller and, as such, the Board found their opinions were better informed as to Mr. Keller's occupational exposure and medical condition. Moreover, the Board noted that Dr. Craig and Dr. Mehta are both hematologists/oncologists while Dr. Martin is an occupational medical physician, and found that the specialized knowledge and experience of Dr. Craig and Dr. Mehta gave them a distinct advantage over Dr. Martin "in assessing the etiology of [Mr. Keller's] blood disease."

The Board further found that the medical records demonstrate that Mr. Keller presents with unique features that are characteristic of benzene-induced MDS, such as monosomy 7 and his age at diagnosis. Although Dr. Martin opined that Mr. Keller's diagnosis was not consistent with the latency period of benzene-induced MDS, the Board found that multiple studies were submitted into evidence demonstrating that "the latency period for benzene-induced MDS varies widely among individuals and cannot be reduced to a specific period of time." Additionally, Dr. Martin considered only Mr. Keller's employment with CCRR and ignored his substantial exposure to benzene while working at other employers. The Board found that Mr. Keller's cumulative exposures while working in the State of West Virginia must be considered in determining the compensability of his claim.

In sum, the Board concluded that Dr. Martin's report and testimony were the only evidence of record supporting a finding that Mr. Keller's MDS diagnosis is unrelated to his occupational exposure and that Mr. Keller had shown by a preponderance of the evidence that "his occupational exposure to benzene was a contributing factor in his development of MDS." Accordingly, the Board reversed the claim administrator's June 26, 2019, order and held the claim compensable for MDS. CCRR now appeals.

Our standard of review is set forth in West Virginia Code § 23-5-12a(b) (2022), in part, as follows:

> The Intermediate Court of Appeals may affirm the order or decision of the Workers' Compensation Board of Review or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the Workers' Compensation Board of Review, if the substantial rights of the petitioner or petitioners have been prejudiced because the Board of Review's findings are:
> (1) In violation of statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the Board of Review;
> (3) Made upon unlawful procedures;
> (4) Affected by other error of law;
> (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

*Duff v. Kanawha Cnty. Comm'n*, No. 22-ICA-10, __ W. Va. __, __, __ S.E.2d __, __, 2022 WL 17546598, at *4 (Ct. App. 2022).

On appeal, CCRR argues that there is no nexus between Mr. Keller's diagnosis of MDS and his work at CCRR. This argument is misplaced. West Virginia Code § 23-4-1(f) (2021) contemplates developing occupational diseases through on-the-job exposure while employed by multiple employers. This section of the Code gives the Insurance Commissioner the option of allocating responsibility of liability between multiple employers. However, beginning in 2006, the Insurance Commissioner exercised the discretion to not allocate or divide charges for claims among employers with whom a claimant had been exposed to an occupational disease as set forth in West Virginia Code § 23-4-1 (2021).[4] This practice was approved by the Supreme Court of Appeals of West

---

[4] The document, "Notification for Claims Allocation," is available on the Insurance Commissioner's website. In this notice, the Insurance Commissioner explains that:

> [t]his decision was based on a careful analysis that the benefit of allocating claims would be outweighed by the problems which would be created by attempting to allocate claims in West Virginia's privatized workers' compensation market.

http://www.wvinsurance.gov/Legal-Authority (last visited January 18, 2023).

Virginia in *Pioneer Pipe, Inc. v. Swain*, 237 W. Va. 722, 726, 791 S.E.2d 168, 172 (2016). In *Pioneer Pipe*, the claimant only worked for the employer for forty hours before filing a workers compensation claim for hearing loss caused while working as a heavy-equipment operator. *Id.* at 722, 791 S.E.2d at 168. Although the claimant worked in noisy environments for over thirty years, the employer was charged with the entirety of the claim because the claimant became eligible for the compensation award while working for the employer. *Id.* at 727, 791 S.E.2d at 173.

Here, the question is not whether Mr. Keller developed an occupational disease with one particular employer. The correct inquiry is whether Mr. Keller's occupational disease was caused from his exposure history through employment which can, as in this case, be from multiple employers, including exposure during his employment by CCRR. If a claimant proves by a preponderance of the evidence that he or she developed an occupational disease through exposure during employment, the last employer where the claimant was exposed may be chargeable for the full liability of the claim.[5]

Based on our review of the record, we find no error. The Board was not clearly wrong when it determined that Mr. Keller established that he was occupationally exposed to benzene while employed by CCRR and that his exposure was sufficient to cause the development of MDS. Further, the Board was not clearly wrong when it adopted the findings of Dr. Ross, Mr. Rose, Mr. Mehta, and Dr. Craig over the findings of Dr. Martin. Accordingly, we affirm the Board's August 4, 2022, order.

Affirmed.

**ISSUED:** February 2, 2023

**CONCURRED IN BY:**

Chief Judge Daniel W. Greear
Judge Charles O. Lorensen
Judge Christopher J. McCarthy, sitting by temporary assignment

Judge Thomas E. Scarr, voluntarily recused

---

[5] We recognize concerns about the fairness to employers like CCRR in cases like this, as discussed in the 2016 majority, concurring, and dissenting opinions of the Supreme Court of Appeals of West Virginia in *Pioneer Pipe,* 237 W. Va. 722, 791 S.E.2d 168.